**WEST VIRGINIANS FOR LIFE, INC., Joseph Shoda, Treasurer of West Virginians For Life, Beth Pruett, Kenneth Pruett, Dallas Bragg, and Karen Suzanna Brooks, Plaintiffs,**

**v.**

**Charles R. SMITH, in his official capacity as Prosecuting Attorney for Mercer County, West Virginia, and as a representative of the class of Prosecuting Attorneys in the State of West Virginia, Ken Hechler, in his official capacity as Secretary of State for West Virginia and as an ex-officio member of the West Virginia Election Commission, Defendants.**

Civil A. No. 1:96–0068.

United States District Court,
S.D. West Virginia.

March 11, 1996.

William C. Porth, Robinson & McElwee, Charleston, WV and James Bopp, Jr., John K. Abegg, Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiffs.

Charles R. Smith, Princeton, WV, for Defendant Charles R. Smith.

Darrell V. McGraw, Jr., Attorney General and Amie Johnson, Assistant Attorney General, Charleston, WV, for Defendant Ken Hechler, Sec. of State.

## MEMORANDUM OPINION

FABER, District Judge.

### I. INTRODUCTION

Plaintiffs filed this civil action on January 30, 1996, seeking declaratory and injunctive relief arising under the Constitution of the United States of America. Plaintiff West Virginians for Life, Inc. ("WVFL") is a nonprofit corporation incorporated in West Virginia which alleges that it would like to engage in "issue advocacy" in West Virginia through the preparation and distribution of voter guides within sixty days of the upcoming primary election. WVFL ordinarily places its name on its voter guides. Plaintiff Joseph Shoda is a West Virginia resident and is the treasurer of WVFL. Plaintiff Dallas Bragg is a resident of West Virginia who would like to distribute voter guides on behalf of WVFL. Plaintiffs Beth and Kenneth Pruitt are West Virginia residents who would like to distribute voter guides anonymously within 60 days of the upcoming primary election. Plaintiff Karen Suzanna Brooks is a West Virginia resident who is not a member of WVFL but has received voter guides from WVFL in the past and would like to receive them in the future.

Defendants in this action are Ken Hechler, Secretary of State of West Virginia, who is the chief election official in West Virginia, and Charles Smith, who is the prosecuting attorney for Mercer County, West Virginia. Plaintiffs have sued defendant Smith as a representative of the class of prosecuting attorneys in the State of West Virginia, and have requested that the prosecuting attorneys for West Virginia be certified as a defendant class pursuant to Federal Rules of Civil Procedure, Rule 23. The court finds it unnecessary to rule on the motion for class certification at this time, finding that injunctive relief directed to the named defendants

will adequately protect the interests of the plaintiffs at this juncture of the case.

Plaintiffs allege that recent amendments to Chapter Three of the "Campaign Finance Laws of West Virginia," W.Va.Code § 3–1A–1 et. seq. (1995), violate the First Amendment by chilling their free speech rights. Plaintiffs seek a declaratory judgment holding the challenged provisions unconstitutional, and a preliminary and permanent injunction prohibiting defendants from enforcing the statute. The court conducted a hearing on the motion for a preliminary injunction on February 27, 1996.[1]

## II. FACTS

Plaintiffs challenge several sections of the Campaign Finance Laws of West Virginia, W.Va.Code § 3–1A–1, et. seq. Section 3–8–5(a) requires that the treasurer of any organization "advocating or opposing the nomination, election or defeat of any candidate or the passage or defeat of any issue, thing or item to be voted upon, ... shall keep detailed accounts of every sum of money or other thing of value received by him ... and of all expenditures and disbursements made" by such organization for political purposes. Section 3–8–5(b) further requires that every organization required to keep detailed accounts pursuant to subsection (a) must file a detailed itemized statement as set forth in subsection (b)(1)–(4). In addition, § 3–8–5(e)(1) provides that

> any person, association, organization, corporation or other legal entity who publishes, distributes or disseminates any scorecard, voter guide or other written analysis or a candidate's position or votes on specific issues within sixty days of an election is presumed to be engaging in such activity for the purpose of advocating or opposing the nomination, election or defeat of any candidate.

Finally, § 3–8–5(f) prohibits the publication, distribution, or dissemination of a scorecard, voter guide, or other written analysis of a candidate's position within sixty days of an election unless the document includes the name of the party responsible for it. Section 3–8–7 sets forth the criminal and civil penalties which result from the failure to comply with § 3–8–5.

Furthermore, W.Va.Code § 3–8–12 provides that "no person shall publish, issue or circulate, or cause to be published, issued or circulated, any anonymous letter, circular or other publication tending to influence voting at any election" and prohibits newspapers or other periodicals from publishing any advertisement which tends to influence voting at any election unless the advertisement is clearly marked as a paid advertisement, and includes the name of the person responsible for it and the name of the candidate on whose behalf it is published. Section 3–8–12(j) sets forth criminal penalties applicable to anyone who violates any provision of § 3–8–12.

Plaintiffs contend that W.Va.Code § 3–8–5, the "60–day voter guide law", is unconstitutionally overbroad because it regulates issue advocacy, which is constitutionally protected, and no compelling state interest permits regulation. (Plf's Reply Mem. at 3–4.) Plaintiffs further assert that the ban on anonymous voter guides is unconstitutionally overbroad in its regulation of issue advocacy. Plaintiffs argue that a preliminary injunction prohibiting defendants from enforcing these unconstitutional statutes is necessary, as they will suffer irreparable harm if they are not able to distribute voter guides within sixty days of the West Virginia primary election, which will take place on May 14, 1996.

## III. STANDING AND RIPENESS

Plaintiffs allege no present injury; they contend that they will be injured in the future if the requested injunctive relief is not granted. Accordingly, the court must determine whether the threatened injuries are sufficiently imminent to be justiciable. The relevant judicial doctrines are standing and ripeness. Standing focuses on whether the interest a plaintiff has at stake is adequate to invoke the protection of judicial decision, while ripeness addresses whether an injury

---

1. By Order entered on February 22, 1996, this court denied plaintiffs' motion to consolidate the preliminary injunction hearing with the trial on the merits.

that has not yet occurred is sufficiently likely to happen. 13A Wright, Miller & Cooper, *Federal Practice & Procedure*, § 3531.12 at 50 (1984).

■ Pursuant to the judicial power of the United States under Article III of the Constitution, courts have the authority to determine actual controversies between parties to lawsuits; the right to declare a law unconstitutional is an incident of that power. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Unless a lawsuit presents an actual "case or controversy" within the meaning of Article III, the court lacks power to rule upon it. For an actual controversy to exist, the plaintiffs must show that they have, in fact, been injured by defendants' challenged conduct. *Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

■ In the recent case of *McIntyre v. Ohio Elections Comm'n*, —— U.S. ——, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), plaintiff had been fined for distributing anonymous leaflets opposing a school tax levy. Plaintiff's standing to sue was undisputed, as she had suffered a concrete injury—conviction of a misdemeanor and imposition of a fine. Here, plaintiffs face similar sanctions, but only prospectively. However, the threat to plaintiffs, while prospective, is of sufficient immediacy to confer standing and satisfy the ripeness requirement since the issues raised are significant ones involving First Amendment freedoms. In *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990), the Supreme Court reiterated that, in order to satisfy the case or controversy requirement of Article III, a plaintiff must have suffered a concrete "injury in fact." In cases where the injury is prospective only, this requirement is satisfied, and the plaintiff has standing to sue, if the alleged harm is imminent and impending. *Id.* at 155, 158, 110 S.Ct. at 1723, 1724. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the fountainhead case involving congressional regulation of elections, illustrates that plaintiffs have met this requirement in the present case. In *Buckley*, candidates brought suit to enjoin enforcement of provisions of federal law which imposed, among other things, limits on campaign spending. The Supreme Court concluded that the interests of certain plaintiffs, while prospective, were sufficient to present "a real and substantial controversy admitting of specific relief...." *Id.* at 12, 96 S.Ct. at 631. The court similarly finds that plaintiffs in this action have presented such a real and substantial controversy, so as to establish standing.

Nor is there a problem with ripeness. It is well-established that an issue is ripe for judicial review when the challenging party is placed in the dilemma of incurring the disadvantage of complying or risking penalties for non-compliance. *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Accordingly, the court finds that the claims presented by plaintiffs are ripe for the court's consideration.

## IV. PRELIMINARY INJUNCTION STANDARD

At the present time, this action is before the court on a motion for preliminary injunction. Accordingly, the court is not ruling on the merits of the case; it is merely determining whether a preliminary injunction should issue.

■ The United States Court of Appeals for the Fourth Circuit has long followed a balancing test in determining whether a preliminary injunction should issue. *See Blackwelder Furn. Co. v. Seilig Mfg Co.*, 550 F.2d 189 (4th Cir.1977). Under *Blackwelder*, four factors must be considered: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiffs will succeed on the merits; and (4) the public interest. *Hughes Network Systems, Inc. v. Interdigital Comm. Corp.*, 17 F.3d 691, 693 (4th Cir.1994) (citing *Blackwelder*, 550 F.2d at 195–96).

■ These factors are not to be given equal weight. Irreparable harm to the plaintiff and harm to the defendant are the two most important considerations. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353,

359 (4th Cir.1991). This "balance of hardships" determines how strong a plaintiff's likelihood of success on the merits must be in order to prevail. *Hughes,* 17 F.3d at 693. When the balance tips decidedly in favor of the plaintiff, the court may issue a preliminary injunction if it concludes that the dispute presents a serious issue for resolution and the injunction will serve the public interest. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1054–55 (4th Cir.1985). As the balance of hardships tips away from the plaintiff, a correspondingly greater showing on the merits is required. *Rum Creek Coal Sales,* 926 F.2d at 359.

## V. THE *BLACKWELDER* STANDARD APPLIED TO THIS CASE

### 1. *Irreparable Harm to the Plaintiff*

■ Any action by a court enjoining or limiting a legislative enactment is a restraint upon the democratic principle and the majority's power to govern. Therefore, such action is not to be undertaken lightly. On the other hand, this court must not lose sight of the fact that this case implicates First Amendment concerns. The pivotal importance of First Amendment freedoms to the proper functioning of a republican form of government has long been recognized. Similarly, the power of the majority has never been viewed as plenary. In *The Federalist,* James Madison, writing under the pseudonym "Publius" to conceal his true identity, warned about the dangers of tyrannies of the majority. *The Federalist* No. 10, at 57 (James Madison) (Modern Library ed. 1937). He returned to this theme in *The Federalist,* No. 51, in a passage quoted by Alexis de Tocqueville who observed, "if ever the free institutions of America are destroyed, that event may be attributed to the omnipotence of the majority...." Tocqueville, *Democracy in America,* Vol. I at 269 (Vintage Books ed. 1980).

■ First Amendment freedoms are designed to insure the proper functioning of the democratic process and to protect the rights of individuals and minorities within that process. In *Palko v. Connecticut,* 302 U.S. 319,

327, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937), Justice Cardozo, referring to freedom of speech, said "[i]t is the matrix, the indispensable condition, of nearly every other form of freedom." Similarly, Justice Stone, writing in *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938), suggested that legislative restrictions on freedom of expression should receive special scrutiny by the courts because such legislation restricts the political process. Furthermore, as one writer has observed, "[I]t is the *fact* of participation in the political process that the [First Amendment] protects, not its qualities of sanity and objectivity." BeVier, *The First Amendment and Political Speech: An Inquiry Into the Substance and Limits of Principle,* 30 Stan. L.Rev. at 299, 317 (1978).

In view of the importance of First Amendment freedoms as illustrated by these authorities, it is not surprising that the Supreme Court, in an opinion authored by Justice Brennen, has held: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

The court, therefore, concludes that the threatened loss to plaintiffs of their right to free speech during the sixty-day period immediately preceding the impending West Virginia primary election constitutes irreparable harm of significant magnitude. The occurrence of such harm is virtually assured if the challenged statute is allowed to become operative in its present form.

### 2. *Likelihood of Harm to Defendants if the Preliminary Injunction is Granted*

In contrast to the significant harm which plaintiffs will suffer if the injunction is denied, the degree of harm to be suffered by defendants, should an injunction issue, is slight. Defendants can point to no lasting harm caused by the granting of a preliminary injunction. They argue that the electoral process, if left unregulated, is subject to corrupting influences. But a preliminary injunction, carefully tailored to limit its scope,

will not unduly restrict the defendants' power to regulate the election process in legitimate ways.

Thus, the balance of hardships tips decidedly in favor of plaintiffs in this case.

### 3. *Likelihood that Plaintiffs will Succeed on the Merits*

It can hardly be questioned that this case presents serious questions for resolution. Moreover, for at least three reasons, plaintiffs' prospects for success on the merits are quite strong. First, as the statutes at issue regulate political expression at "the core of the protection afforded by the First Amendment," this court must apply "exacting scrutiny." *McIntyre*, —— U.S. at —— - ——, 115 S.Ct. at 1518–19 (citing *Buckley*, 424 U.S. at 14–15, 96 S.Ct. at 632–33).

Second, the challenged statute is erected on the unstable foundation of a presumption that any voter guide distribution within sixty days of an election is express advocacy and therefore subject to regulation under the principles of *Buckley v. Valeo*. This presumption flies in the face of the specific teaching of *Buckley* and *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Those cases adopted a bright-line rule for determining whether advocacy is express advocacy[2] and therefore subject to regulation, or issue advocacy which may not be regulated. By creating a presumption that a voter guide is, per se, express advocacy, the West Virginia Legislature attempts to change the definition of express advocacy laid down by the United States Supreme Court. The effect of West Virginia's presumption is to regulate political advocacy which the Supreme Court has stated is protected by the First Amendment. Obviously, a state legislature cannot alter the Supreme Court's interpretation of the Constitution. Instead of creating a presumption which applies to all political advocacy, West Virginia should examine such advocacy on a case-by-case basis, and apply the bright-line rule of *Buckley* and *Massachusetts Citizens for Life* to each case. Insofar as the presumption

enacted by the West Virginia Legislature seeks to alter this bright-line rule, plaintiffs have a strong likelihood of proving that the statute is unconstitutionally overbroad.

Finally, it is doubtful that the provisions of the challenged statute prohibiting anonymous advocacy can survive constitutional muster. In the recent case of *McIntyre v. Ohio Elections Comm'n*, —— U.S. ——, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Supreme Court retraced the history of anonymous publications and found that such publications have played an important role in the progress of mankind. The decision to publish anonymously, the Court concluded, like other decisions concerning omissions or additions to content of a publication, is an aspect of freedom of speech protected by the First Amendment. *Id.* at ——, 115 S.Ct. at 1516.

There are at least two sound policy reasons for protecting the right of anonymous publication. First, the decision to publish anonymously may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by desire to preserve as much of one's privacy as possible. *Id.* Second, anonymity enables a writer who is personally unpopular to ensure that readers will not prejudge the writer's message simply because they do not like its proponent. *Id.* at ——, 115 S.Ct. at 1517.

The historical role played by anonymous publication, and its importance to the development of free institutions, was traced by Justice Black in *Talley v. California*, 362 U.S. 60, 64–65, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 (1960). Justice Black concluded: "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.... Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." *Id.* In *McIntyre*, the Supreme Court struck down, as overbroad, an Ohio statute which required that any writing intending to "influence" the voters in any election contain the name of

---

**2.** Express advocacy is limited to "communications that in express terms advocate the election

or defeat of a clearly identified candidate...." *Buckley v. Valeo*, 424 U.S. at 44, 96 S.Ct. at 647.

the writer. The Supreme Court reasoned that the Ohio statute applied, not only to candidates and their supporters, but to individuals acting independently. *McIntyre,* —— U.S. at ——, 115 S.Ct. at 1521. Similarly, the prohibition on anonymous voter guides at issue in this case does not narrowly apply to candidates and their supporters, but sweeps in the activities of independent groups and individuals engaging in issue advocacy. Based, in part, on the holding in *McIntyre,* the court concludes that, when it applies exacting scrutiny to the West Virginia ban on anonymous voter guides, there is a strong likelihood that plaintiffs will succeed on the merits.

Accordingly, there are at least two provisions of the statute which raise serious constitutional problems and point to probable success by plaintiffs on the merits—the presumption that all advocacy within sixty days of an election is express advocacy and the ban on anonymous issue advocacy.

#### 4. *The Public Interest*

The importance and value of freedom of speech in a democratic society have been amply discussed above and need not be reiterated here. Protection of these values is of critical public interest.

## VI. CONCLUSION

The court finds that plaintiffs will be irreparably harmed unless defendants are preliminarily enjoined from enforcing the statutory provisions at issue, defendants will not be irreparably harmed by the issuance of a preliminary injunction, plaintiffs have shown a likelihood of success on the merits, and the public interest will be served by the court's injunction.